209 N.J. Super. 499 (1986)
507 A.2d 1194
PAUL ANASTASIO, MARVIN GREENMAN AND ORESTO ANASTASIO, INDIVIDUALLY, AND T/A BRIAR HILL VILLAS COMPANY, A PARTNERSHIP, PLAINTIFFS-RESPONDENTS,
v.
PLANNING BOARD OF THE TOWNSHIP OF WEST ORANGE, JOSEPH BRENNAN, JR., JOSEPH ANTONUCCI, MARY LANNON, MARY ANDERSON, ALTON WILLIAMSON AND SAMUEL SPINA, DEFENDANTS-APPELLANTS, AND FRED W. LA BASTILLE AND JOSEPH BRENNAN, SR., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 24, 1986.
Decided April 17, 1986.
*503 Before Judges MORTON I. GREENBERG, J.H. COLEMAN and HAVEY.
Thomas C. Brown argued the cause for appellant Planning Board of the Township of West Orange.
Thomas M. McCormack argued the cause for appellant Joseph Brennan, Jr. (McCormack & Petrolle, attorneys; Thomas M. McCormack and Kenneth W. Kayser on the brief).
Milton Malkin argued the cause for appellant Alton Williamson.
Francine A. Schott argued the cause for appellant Samuel Spina (Clapp & Eisenberg, attorneys).
Roy B. Greenman argued the cause for respondents (Thayer, Greenman & Budin, attorneys).
Fred G. Stickel, III, General Counsel, New Jersey State League of Municipalities, filed a brief amicus curiae (Robert F. Rogers, of counsel and on the brief).
Hutt, Berkow & Jankowski, filed a brief amicus curiae for the New Jersey Builders Association (Wayne J. Peck, on the brief).
The opinion of the court was delivered by MORTON I. GREENBERG, P.J.A.D.
This matter comes on before this court on appeal from a judgment for punitive damages in an action brought under the federal Civil Rights Act, 42 U.S.C.A. § 1983. The action was generated by difficulties plaintiff,[1] a partnership engaged in *504 real estate development, had in obtaining site plan approval for a project in West Orange. Because of the failure of the trial judge to make adequate findings of fact in this nonjury matter, thus leading us for the reasons we later explain to exercise original jurisdiction to make the necessary findings, we are compelled to set forth at length the procedural and factual background of this case.
This appeal is in the third related action brought by plaintiff. The original action was started in July 1980 when plaintiff filed a complaint in lieu of prerogative writs against the Planning Board of West Orange challenging its denial of plaintiff's 44 unit site plan application. That action was withdrawn when the board agreed to hold a conceptual hearing to consider the application. Following the hearing, plaintiff formally renewed its request for site plan approval but its application was denied by resolution of the board dated December 2, 1981.
Plaintiff then instituted a second action in lieu of prerogative writs again challenging the board's refusal to grant it site plan approval. Further, it appears that plaintiff asserted the board, by its inaction within the time constraints for approval or disapproval of plaintiff's application under the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq., had approved the plan.[2] Finally, in the second action plaintiff sought compensatory and punitive damages for violation of its civil rights. The damage claims, however, were dismissed with the proviso that plaintiff could file a separate complaint for their recovery. Plaintiff filed that damage action under 42 U.S.C.A. § 1983 on August 16, 1982 against the board, all but one of its members and the West Orange municipal planner, Fred W. LaBastille. In the *505 damage action, now before us on this appeal, plaintiff asserted defendants had violated the Municipal Land Use Law. LaBastille was named as a defendant because as the municipal planner he was involved in the consideration of the application. Subsequently, on October 4, 1982 plaintiff obtained an order in the second action directing the board to approve its application for a 36 unit townhouse plan, a smaller project than plaintiff originally proposed.
The damage action was tried without a jury by Judge Feinberg who, in a written opinion dated September 10, 1984, held the board liable for compensatory damages of $66,300 with interest to be added. In addition he assessed punitive damages of $5,000 each against board members Samuel Spina, Alton Williamson and Joseph Brennan, Jr. However, he dismissed the action against board member Joseph Brennan, Sr. and against LaBastille.[3] The judge subsequently assessed attorney's fees and costs in plaintiff's favor.
The defendants held liable appealed and plaintiff separately appealed the order dismissing the action as to LaBastille and Joseph Brennan, Sr. These appeals were consolidated. Subsequently the Township of West Orange, which has never been a party to this case, reached an agreement with plaintiff settling the compensatory damages judgment, including the attorney's fees, for $55,000 but preserving plaintiff's three $5,000 punitive damages judgments, an action it undertook because of its perceived position as an indemnitor of the board and its members for compensatory damages. However, as there seems to have been some question as to its authority to make the settlement, it brought a separate case against the plaintiff herein and the board and obtained a summary judgment, from *506 which no appeal was taken, that it could settle the judgment for the compensatory damages and attorney's fees for the agreed-upon $55,000. The $55,000 has been paid and plaintiff has executed a release of all its claims except for the three punitive damages judgments and has abandoned its appeal. While the board and an amicus curiae have requested us to review the compensatory damages judgment, we think it would be inappropriate to do so, even though we are aware that our opinion may be taken as reflecting a view on the efficacy of the entire judgment and may be regarded as precedential in similar compensatory damages actions. Accordingly on March 25, 1986 we ordered a stipulation of dismissal of the appeals executed by plaintiff's attorney and the township attorney filed, reserving for review only the punitive damages judgments against Spina, Williamson and Joseph Brennan, Jr., whom we shall henceforth call, to the exclusion of the other defendants, appellants.
The facts in this case are complex. As we have indicated, plaintiff is a partnership involved in real estate development. It is highly experienced with at least one partner who has built residential units, multi-family housing, commercial and office buildings, shopping centers and, in his words, "a smattering of just about everything." Plaintiff acquired the property involved, an eight-acre parcel zoned for cluster development, on Herbert Terrace in West Orange near Livingston, in November 1978. This eight-acre tract was adjacent to a seven-acre parcel on Glenview Drive in West Orange on which plaintiff, after obtaining required municipal approvals, previously constructed a 42 unit townhouse development.
Plaintiff originally sought to build 44 townhouses on the eight-acre parcel, a development requiring site plan approval. Plaintiff submitted an application for the approval to LaBastille in May 1979 for consideration by a subcommittee of the board. The subcommittee met with plaintiff that month and advised it of its concern with the fact that the proposed plan involved "crossing over" a dedicated town street, Herbert Terrace. The subcommittee was also troubled by the possibility that plaintiff's *507 plan could "seal off" or landlock a property on Herbert Terrace to the rear of plaintiff's land. These concerns should not have been a surprise to plaintiff as it understood when it acquired the eight acres that Herbert Terrace could cause it a problem. Williamson suggested to plaintiff at the meeting that it might obtain a vacation of Herbert Terrace by the municipal governing body but plaintiff, though attempting to do so, could not arrange that.
After plaintiff failed in its efforts regarding the vacation, it revised the site plan. Then in October 1979 it submitted the revised plan together with a written reply to concerns expressed at the May 1979 meeting by LaBastille. In November 1979 plaintiff's application was considered at another subcommittee meeting. At that meeting LaBastille stated that the parcel did not satisfy the provisions of an ordinance requiring a developer to own five contiguous acres. Plaintiff disputed that assessment and sought to have its application placed on the board's November agenda. Williamson, the subcommittee chairman, wanted to accommodate plaintiff in this but could not do so as LaBastille indicated that the board's agenda was full for that meeting. Consequently Williamson said he would place the application on the board's December agenda. However, the application was not considered by the board in December as plaintiff had not supplied written responses which the board understood it would furnish to concerns raised at the November 1979 subcommittee meeting. Further, the board was under the mistaken impression that plaintiff had failed to submit a required environmental impact statement. Plaintiff had not supplied the written responses as it did not realize they had been requested. When plaintiff discovered the board would not consider its application in December, it met instead with the subcommittee. According to plaintiff's testimony, at this meeting LaBastille said plaintiff's application would go through over his dead body.
Following resolution of the misunderstanding regarding their necessity, the written responses were prepared. Plaintiff then *508 attended the January 1980 subcommittee meeting where it was advised by LaBastille that he wanted opinions on the legal issues raised by the application. The municipal attorney was present at the meeting but did not answer the questions at that time. Notwithstanding the lack of resolution of the legal issues, plaintiff attended the January 1980 board meeting. An attorney representing the board was present at the meeting but declined to resolve the legal questions. Nevertheless plaintiff wanted its application considered but Williamson objected to doing so without having the legal matters resolved. Williamson told plaintiff that if it wanted to force a decision in these circumstances it would be turned down. Plaintiff did not press the matter further and instead waived its rights under provisions of the Municipal Land Use Law providing for automatic approval of certain applications if not acted on by the board within 45 days. See N.J.S.A. 40:55D-46.1; N.J.S.A. 40:55D-50.
Subsequently a legal opinion was given that plaintiff's application could be heard and, after plaintiff attended another subcommittee meeting, the matter was taken up at the February 1980 board meeting. At this meeting neighbors from Livingston, described by plaintiff as "filibustering," objected to plaintiff's application as they were concerned about the impact of the project on traffic and they believed the construction would landlock certain Livingston residents. Indeed, because of these problems the Township of Livingston brought a suit to bar the board from considering plaintiff's application. In that case an injunction or restraining order was issued precluding the board from considering the application but it was ordered vacated on February 29, 1980, though the formal order was not entered until March 11, 1980.
Plaintiff next attended the regular April 1980 board meeting but determined it did not want its application considered then because LaBastille had erroneously informed certain objectors that it would not be taken up at that meeting and had failed to advertise the matter properly. Plaintiff was concerned that these defects could have resulted in the invalidation of any *509 approval granted by the board. Because of the delay, plaintiff again waived its rights under the 45 day rule.
The matter was, however, considered by the board at a special meeting on April 16, 1980. At that time the board adopted a resolution denying site plan approval for the following reasons recited in the resolution:
... the site plan does not comply with the Zoning Ordinance of the Town of West Orange in that it is not in the best interests or conformity or intent of the Master Plan and does not adhere to the true concept of cluster zone and purd[4] zone, that there is a lack of open space, that there are inadequate sideyard setbacks and rear yard setbacks, that it would pose a hazard on Herbert Terrace and to the safety and well being of the surrounding residents, that the building coverage is 23.1% which is excessive, that at present the lots are not contiguous, and the Board would not recommend the vacating of the public street, that there are no sidewalks shown and parking provided is inadequate, as offstreet is shown to back onto a public right-of-way which is not permitted.
Plaintiff then filed the first of the three actions already described, the July 1980 complaint in lieu of prerogative writs. Notwithstanding the lawsuit, the parties continued to meet in an attempt to resolve the matter. Plaintiff worked with LaBastille to develop an acceptable plan and met with the board in February 1981 so the board could consider the plan on a nonbinding conceptual basis. According to plaintiff, at that meeting Joseph Brennan, Jr. expressed his dislike of the architecture of the project and compared plaintiff's project to a development in another municipality that was nice when constructed but became a slum.
There was another board meeting in March. Plaintiff claims that at this meeting Spina expressed his dislike in general for the cluster zoning ordinance and suggested that plaintiff meet with two adjoining landowners who were planning to develop in the area to attempt to formulate an overall plan rather than having piecemeal development. Plaintiff also testified that Spina stated he gave it an "A" for effort. Brennan and Spina both testified that they made the statements attributed to them *510 except Spina claimed he never expressed general dislike for cluster zoning.
As we have indicated, plaintiff's original action was dismissed when the parties agreed that plaintiff could again meet with the board so its plan could be considered on a conceptual basis. Prior to that meeting plaintiff's application was again considered at a subcommittee meeting where Williamson, who apparently was not aware of the agreement reached to terminate the case, declined to place the matter on the board's agenda. According to plaintiff, Williamson said he had been told by "higher ups" that plaintiff would never be put on the agenda, and that it could use the land "as a tomato patch." Williamson in his testimony denied having made these comments. Regardless of what may or may not have been said by Williamson, plaintiff's application, now reduced to 36 units with a resulting increase in open space, was placed on the board's agenda for the June 1981 meeting and was discussed at that time. Plaintiff considered that, except from Spina, it received a favorable reaction from the board. The parties are in disagreement as to whether any vote was taken at the June meeting, plaintiff claiming that its plan was approved conceptually but defendants asserting the project was simply generally discussed. In any event it is clear that there was no final approval at that time.
Following the June meeting, plaintiff prepared a formal application for site plan approval for 36 units. This was submitted and a public hearing on the application was scheduled by the board to consider it in September 1981. However the hearing was adjourned one month at the request of the Township of Livingston so Livingston could obtain a traffic report on the project. The board then held a hearing on the application on October 16, 1981. However, because of the length of the October meeting the matter was not resolved at that time. The application was again brought up at the November 1981 meeting when the board voted to deny it. The board subsequently *511 adopted a resolution dated December 2, 1981 including the following findings:
1. The development is not in the best interests of the Township of West Orange[.]
2. The proposed plan does not represent the true intent of the zoning ordinances as it applies to cluster zoning[.]
3. There is insufficient open space[.]
4. Vehicles must back out on to the streets[.]
5. The piecemeal development will have an adverse impact upon the area.
6. The development represents a traffic hazard to the general area[.]
7. There are not five continuous acres because a township street goes through the tract[.]
8. The traffic flow out on to Herbert Terrace and then to Northfield Ave. will be too heavy under present conditions.
Plaintiff then filed the second action described above. While that case was pending plaintiff entered into an agreement to sell the property to a purchaser who intended to construct 25 single family dwellings on the land. The agreement, however, was conditioned on the purchaser obtaining subdivision approval and a variance. The purchaser did obtain these approvals from the board subject, however, to further conditions involving approval of the municipal engineer and installation of a sanitary holding tank. Inasmuch as these conditions could not be met, the sale was not completed.
As already noted, on October 4, 1982 the trial court ordered the board to grant site plan approval. The order indicates that the judge found the board acted arbitrarily and capriciously in denying plaintiff's application. The proceedings leading to this order are not before us and thus we do not know why this decision was reached. We do know, however, that no appeal was taken from that order and the board on November 3, 1982 granted plaintiff site plan approval.
Notwithstanding this approval, plaintiff still could not proceed with the project because in West Orange the chairman of the board will not sign an approved site plan until a developer reaches an agreement with the municipality to ensure the developer completes installation of improvements to the site *512 including installation of streets, sewers and other construction items. Until the site plan is signed, the building department will not issue building permits. The negotiations regarding the agreement took 11 months until October 1983 and thus the site plan was not signed by Williamson, who had become the board chairman July 1, 1983, until December 12, 1983. After the plan was signed plaintiff, instead of constructing the project, sold the land.
As we have indicated, appellants testified. In addition to denying certain statements attributed to him as we set forth above, Williamson said he had no feelings of animosity toward plaintiff. He stated he voted to deny the application at the November 1981 meeting because he agreed with the eight reasons set forth in the resolution rejecting the plan. Williamson also testified that he was unaware when he became chairman of the board of the procedure for signing site plans. He further said that when plaintiff's plan was presented to him he signed it immediately. He also stated he would not sign the site plan until it was recommended to him for signature by the town engineer.
Joseph Brennan, Jr. testified that he was a member of the planning board from July 1, 1980 until June 30, 1982. He denied feeling animosity toward plaintiff and said he voted against the reduced 36 unit development because there were a number of problems with the plan, including traffic in and out of the development, and parking. He further indicated that, although he had compared the project to a development in another municipality that had become a slum, he had given conceptual approval to plaintiff's plan in June 1981.
Brennan testified he believed that as a board member he had the power to vote against an application even if it conformed to applicable ordinances if "the plan is not acceptable for the overall scheme of things," or if it was aesthetically unpleasing or if it was not in the best interests of the municipality. Brennan, who was also on the municipal governing body, stated *513 that Spina had engaged in general discussions with that body over rezoning the entire town and had discussed problems regarding cluster zoning. Brennan said he and Spina were unhappy with the zoning ordinance but this was not why he opposed plaintiff's plan.
Spina denied having any feelings of malice toward plaintiff. He testified that he voted against the 36 unit development because of numerous problems. He believed the road ownership situation had not been clarified and he felt all the traffic issues had not been resolved. He indicated that neighbors were also concerned about traffic, access was a problem and "the general layout of the entire development I don't think was good." He considered that if land behind plaintiff's parcel, then being considered for a 300 unit project, was developed all traffic from that project would have to pass through Herbert Terrace. Spina also testified that after the trial court ordered the board to approve the application and the possibility of an appeal was raised he opposed that procedure as he did not want to delay plaintiff any further. He also indicated that when he was on the governing body he voted in favor of cluster zoning.
When Spina was asked on cross-examination about his testimony at a deposition referring to the possibility that plaintiff's development would become a slum, he was unable to recall making that statement. He reiterated that he voted against the application because of the questions of whether the Herbert Terrace street was dedicated and whether plaintiff's parcel included five contiguous acres. In voting he also took into account the parking problem, absence of room for sidewalks and the traffic problem.
Judge Feinberg's decision is unusual as it is set forth in two parts. At the conclusion of plaintiff's case defendants moved to dismiss the action on the grounds it was barred by their absolute or qualified immunities. The judge, in a written but unreported opinion dated June 1, 1984, denied these motions. In that opinion he outlined the background of the case as *514 presented by plaintiff and concluded that defendants did not have absolute immunity. He indicated, however, that defendants might have qualified immunity if they acted without malice to deprive plaintiff of a constitutional right or did not know and reasonably should not have known their actions would violate a clearly established constitutional right of plaintiff. The judge denied the motion to dismiss because defendants had not met the burden of establishing they had a qualified immunity. The judge considered: "There are still pending questions of malice, good-faith and knowledge on the part of Defendants."
Following the denial of the motion, the trial was resumed. At the end of all the evidence the judge decided the case on September 10, 1984 in an opinion reported at 197 N.J. Super. 457. At the outset of the opinion the judge indicated "The events giving rise to this suit are detailed in an opinion of this court," referring to the unreported opinion of June 1, 1984.[5] The judge set forth that for plaintiff to prevail it must allege "a deprivation of a constitutional right done under color of state law." 197 N.J. Super. at 461. He pointed out that it is clear that defendants acted under state law and their action had been overturned by the order of October 4, 1982 requiring approval of the site plan. He then said the issue "to confront the court is the one dealing with qualified immunity." Ibid. The judge then reviewed the law regarding qualified immunity and considered the actions of defendants. He said plaintiff had long been delayed, sometimes legitimately, but "a vast majority of the delays were mere delaying tactics." Id. at 464. He pointed out that for 13 months after the board approved the site plan as *515 ordered by the court plaintiff continued to be delayed until it was finally signed. Ibid. He then stated:
It is apparent from the factual record that defendants were not acting with sincerity and with a belief that they were doing right. Plaintiffs encountered too many `coincidental' obstacles in their quest for site plan approval. This court has no difficulties in concluding that defendants were acting with malicious intent which resulted in depriving plaintiffs of their rights. [Ibid.]
Finally, on the liability issue the judge concluded defendants knew they were violating plaintiff's constitutional rights and thus they were not entitled to qualified immunity.
The judge then reached the damage issue stating:
I find that plaintiffs are entitled to compensatory damages dating from November 1982 when the site plan approval was granted until December 1983 when the property was subsequently sold, plus interest dating from November 1982 together with attorney fees and punitive damages.
Accordingly, defendants Joseph Brennan, Sr. and Fred W. LaBastille are dismissed and are not parties to the damage issue. [Id. at 465]
The judge awarded compensatory damages of $66,300 and interest. He also fixed punitive damages of $5,000 each against appellants. Finally he indicated he would subsequently award counsel fees. On November 2, 1984, after considering plaintiff's certification and hearing argument, he awarded counsel fees and costs of $12,150.75. No order for judgment was entered at that time but on January 13, 1986 an order was entered in the trial court nunc pro tunc providing that the opinion of September 10, 1984 was entered as the final order in this case.[6]
Preliminarily, we are constrained to make certain observations with respect to the trial court's opinion of September 10, 1984. R. 1:7-4 required the judge in this civil action tried without a jury to find the facts and state his conclusions of law thereon. This duty was explained by the Supreme Court in Curtis v. Finneran, 83 N.J. 563 (1980) as follows:
In a non jury civil action, the role of the trial court at the conclusion of the trial is to find the facts and state conclusions of law. R. 1:7-4. Failure to perform that duty `constitutes a disservice to the litigants, the attorneys and *516 the appellate court.' Kenwood Assocs. v. Bd. of Adj. Englewood, 141 N.J. Super. 1, 4 (App.Div. 1976). Naked conclusions do not satisfy the purpose of R. 1:7-4. Rather, the trial court must state clearly its factual findings and correlate them with the relevant legal conclusions. [83 N.J. at 569-570]
Here it is obvious that the trial judge, though unquestionably conscientious in his efforts to comply with R. 1:7-4, was not successful. In fact his opinion is so imprecise that we do not know the answer to the fundamental question of why appellants were held liable and Joseph Brennan, Sr. and LaBastille were not.[7] After finding plaintiff was entitled to compensatory damages by reason of the delay from November 1982 until December 1983 the judge said: "Accordingly, defendants Joseph Brennan, Sr. and Fred W. LaBastille are dismissed and not parties to the damage issue." But the judge did not explain why they were dismissed. One reasonable explanation would be that none of that delay of 13 months after approval of the site plan was attributable to Joseph Brennan, Sr. or LaBastille and the judge was fixing punitive damages only for conduct during that period. We suggest this explanation because LaBastille testified he only held his position until June 1982 and, although we are uncertain of the date, Joseph Brennan, Sr. died before the trial. Further, inasmuch as the judge fixed compensatory damages only for the delay during the 13 month period, it would be logical for him to have fixed punitive damages for conduct during the same time.
But the difficulty with this explanation is that Joseph Brennan, Jr. was not on the board after June 30, 1982. Thus if the judge was fixing the punitive damages only for conduct in the 13 month period immediately before the signing of the site plan, we cannot understand how Joseph Brennan, Jr. could have been *517 held liable. Yet if the judge was fixing liability for punitive damages for conduct over the entire time from when plaintiff first filed its application until the signing of the site plan, we do not know why appellants were held liable and LaBastille and Joseph Brennan, Sr. were not.
From our study of the record we can conceive of three bases for imposition of punitive damages: delay in consideration of plaintiff's plans; the rejection of the final plan; and delay in the signing of the final plan after it was approved by the board. We see no colorable basis for an award of damages by reason of the rejection of the revised plan on April 16, 1980 as no court has set aside the resolution disapproving that application. But of the three possible bases for the punitive damages we cannot be certain which one or more was the basis for the awards.
Unfortunately there are other problems with the findings as well. In ruling that defendants had violated plaintiff's constitutional rights, the judge indicated that the vast majority of the delays plaintiff faced "were mere delaying tactics" and, after the approval of the site plan in accordance with the court order of October 4, 1982, there were "more delaying tactics" and the board directly or indirectly delayed the final signing of the site plan. The judge further indicated plaintiff faced "too many `coincidental' obstacles in their quest for site plan approval." He also said "that defendants were acting with malicious intent which resulted in depriving plaintiffs of their rights." 197 N.J. Super. at 464.
The difficulty with these conclusions is obvious. Firstly, we are not told with specificity what the unreasonable delaying tactics were and what each defendant did. We point out that this was a large project which according to the evidence would significantly impact in its area. It is not surprising that there was delay in the approval of such a project. Further, while there was a delay after the approval of the site plan, there are no specific findings of facts attributing that delay to defendants. *518 Nor do we know what evidence convinced the judge defendants were malicious in their actions.
We recognize, of course, that in a sense the reported opinion is incomplete because it refers to the unreported opinion of June 1, 1984. But the earlier opinion rendered at the end of plaintiff's case before appellants and other defendants testified did not and obviously could not have contained findings of fact on which an opinion at the end of the entire case could be based.
Ordinarily the absence of comprehensible findings would lead to a remand. But this case already has had a protracted history which we are reluctant to prolong. Further, we understand that the trial judge has retired and we are convinced finding the facts in this case does not require an assessment of credibility which can be made best by a trial judge. Consequently, to the extent necessary we will exercise original jurisdiction under R. 2:10-5 and make findings of fact to bring this matter to a conclusion. See Farmingdale Realty Co. v. Bor. of Farmingdale, 55 N.J. 103, 106 (1969). We thus reach the merits of the case.
In order to recover in this matter under 42 U.S.C.A. § 1983, plaintiff was obliged to establish that defendants violated some underlying constitutional right of plaintiff such as a protected liberty or property interest. See Daniels v. Williams, 474 U.S. ___, ___, 106 S.Ct. 662, 663-665, 88 L.Ed.2d 662, 666-667 (1986). Judge Feinberg indicated that the constitutional violations in this case were the flagrant violation of the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq.
While the judge did not indicate what provisions of that law were violated nor what role each defendant played in the violations, he did point out that the law includes provisions intending to avoid protracted attempts to gain required approvals from the appropriate municipal land development authority. 197 N.J. Super. at 464-465. This would indicate he considered that there had been a violation of plaintiff's property interests.
*519 Plaintiff's brief supports this conclusion for it includes citation of several cases for the proposition that "any action depriving an owner of undeveloped land of all beneficial use of that land for a significant period of time, is a taking." Thus it appears that in plaintiff's view its constitutionally protected property interests were infringed by defendants' conduct violative of the due process and taking clauses. Accordingly, we consider whether the record supports a finding that appellants' conduct on any of the possible bases for liability we have stated, violated plaintiff's constitutional rights.
Firstly, we are satisfied that plaintiff was deprived of no constitutionally protected interest by reason of delay in the approval of any of its applications. In support of the judgment plaintiff cites cases involving local action substantially impairing a property owner's ability to use his land. See Washington Market Enterprises v. City of Trenton, 68 N.J. 107 (1975) (declaration of area as "blighted" in contemplation of redevelopment, for a lengthy period, constituted taking requiring payment); Lomarch Corp. v. Mayor of Englewood, 51 N.J. 108 (1968) (reservation of land by municipality for one year in contemplation of purchase or condemnation, constitutes temporary taking requiring compensation); Morris County Land, etc. v. Parsippany-Troy Hills Tp., 40 N.J. 539 (1963) (zoning ordinance severely restricting use of property was unconstitutional).
But plaintiff suffered no deprivation in any way akin to that in these cases. No one took or invaded plaintiff's property. At worst plaintiff was simply delayed in having its applications considered. But it was always free to use its property in other lawful ways. Further, plaintiff had adequate recourse against unreasonable delay in the Municipal Land Use Law. That law provides that a planning board shall grant or deny site plan approval within 45 days after an applicant submits a complete application or within such further time as may be consented to by an applicant. A failure to act within that period constitutes *520 an approval. N.J.S.A. 40:55D-46.1a; N.J.S.A. 40:55D-50b. Thus if a planning board delays approving a site plan, rather than violate some constitutionally protected interest of an applicant it will approve its plans.
We also point out that plaintiff agreed on two occasions to waive the 45 day rule and was free at any time to bring an action in lieu of prerogative writs under state law to challenge the action of the board, which it did twice. Plaintiff abandoned its first action and in the second case obtained an order compelling the board to grant the approval. In the light of all these factual and legal circumstances it is clear to us that as a matter of law plaintiff could suffer no violation of any constitutional right by reason of delay in approval of its site plan.
In any event it is clear as a matter of fact that the board did not unreasonably delay in considering plaintiff's plans. Plaintiff submitted its first application in May 1979. It subsequently revised the application and submitted the revised plan in October 1979. Inasmuch as plaintiff did not stand on the original application, it cannot complain of the delay for these five months. The revised application raised legal issues and as a result plaintiff in January 1980 waived the 45 day rule. Thus it could hardly object to further delay. When the legal matters were resolved the application was taken up in February but then the injunction or restraint was issued. While there was a mistake made concerning advertising for the regular April 1980 meeting, its impact was insignificant as the matter was considered and rejected at a special meeting that month. Thus it is absolutely clear that plaintiff suffered no unreasonable delay in the processing of its first application. Further, we reiterate that no court has ever held that the board wrongly rejected that application.
When plaintiff's revised application was rejected it brought its first action in court. Obviously appellants are not responsible for the time required for the judicial process. While the board met with plaintiff during the pendency of the action, it *521 was not until the summer of 1981 that plaintiff filed another revised plan. The board scheduled a hearing on this plan for September 1981 but reasonably adjourned it one month as an accommodation to the Township of Livingston. The hearing was then held at the board's next two meetings and at the second of the two meetings, in November 1981, the application was rejected. In December 1981 the board adopted the formal resolution reflecting its decision. Certainly the board acted with dispatch in processing the final application.
Plaintiff then brought its second action. Once again the board could not be responsible for the time that elapsed for disposition of the case in court. After the court order of October 4, 1982, the board approved the 36 unit plan within one month. In these circumstances it cannot be found that the board unreasonably delayed consideration of plaintiff's applications.
As we have indicated, a possible alternative basis of liability is that, as was held in the second action in lieu of prerogative writs, the board had acted arbitrarily and capriciously in denying plaintiff's final application. But we are unable to uphold the judgment by reason of that denial. Initially on this issue we point out that Judge Feinberg did not say he was imposing liability because of the rejection of plaintiff's application. Rather he was concerned with delay. Thus if we upheld the judgment because of the rejection of the final application we might be substituting a new basis for liability from that used by the trial judge. While it is not unusual for an appellate court to affirm a judgment for a reason not adopted by a trial court, it would be inappropriate to do so where the appeal is solely from an award of punitive damages as they are imposed as a punishment because of the wrongfulness of a particular intentional act. See Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49-50 (1984).
But there is another and more fundamental reason why we should not rule that municipal officials are liable for damages *522 under 42 U.S.C.A. § 1983 merely because a reviewing court finds their action in rejecting an application for development under the Municipal Land Use Law was arbitrary and capricious. Frequently in our law a court on an appeal from action of a public agency will determine if the agency acted arbitrarily or capriciously. See, e.g., Matter of N.J.A.C. 11:1-20, 208 N.J. Super. 182 (App.Div. 1986); Kelly v. Hackensack Meadowlands Develop. Comm'n, 172 N.J. Super. 223 (App.Div. 1980), certif. den. 85 N.J. 104 (1980). Accordingly while the words "arbitrary and capricious" may sound harsh, they are simply the standard of appellate review in particular cases. Further, as happened here, New Jersey law granted the victim of such a mistaken action a complete remedy, so there was no deprivation of any interest, only a delay. See Williamson Planning Comm'n v. Hamilton Bank, 473 U.S. ___, ___, 105 S.Ct. 3108, 3121, 87 L.Ed.2d 126, 144 (1985); Parratt v. Taylor, 451 U.S. 527, 543, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420, 434 (1981).[8] If we held that public officials are liable under 42 U.S.C.A. § 1983 merely for erroneously exercising power under state law remediable under state law, public officials in this state on all levels would face numerous possible claims and indeed would serve in office at great financial peril.
There is an additional reason why appellants should not be liable simply because the board adopted the December 2, 1981 resolution. As we point out later, the Supreme Court has held that municipal entities possess no immunities under 42 U.S.C.A. § 1983. See Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Consequently it may well follow that if appellants could be held liable for the rejection of the site plan by the board, many decisions impacting on constitutionally protected interests by municipal policy makers establishing final governmental policy would render the municipality liable even though, as here, the injured party obtained an *523 adequate remedy under state law. See Pembaur v. City of Cincinnati, ___ U.S. ___, ___, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986); In re Petition for Review of Opinion 552, 102 N.J. 194, ___ (1986). We do not believe that Congress intended such broad liabilities for ordinary governmental decisions.
It is, of course, possible, as we have noted, that the delay in the signing of the plan after site plan approval resulted in the awards of punitive damages. But we doubt that there could be a constitutional violation in that delay as plaintiff points to no statutory provision requiring that the plan be signed. In any event the reason for the delay was that plaintiff was negotiating an agreement with the municipality, an entity which is not a party to this case. Thus factually appellants are not responsible for the delay after the approval. Indeed Joseph Brennan, Jr. was not then even on the board. We further point out that when Williamson was asked to sign the plan he immediately did so. Thus, after considering every possible basis for the judgment, we conclude that plaintiff suffered no compensable injury to any constitutionally protected interest from appellants in this case. It follows, therefore, that the judgments entered against them must be reversed and the case, insofar as not settled, must be dismissed.
We reach the same result on a different basis. Appellants argue that the judgment against them must be reversed as they are immune from plaintiff's claims. The trial judge indicated that in his view defendants were not absolutely immune from liability. In reaching this conclusion he disagreed with Centennial Land & Dev. Co. v. Tp. of Medford, 165 N.J. Super. 220 (Law Div. 1979), and T & M Homes, Inc. v. Township of Mansfield, 162 N.J. Super. 497 (Law Div. 1978). 197 N.J. Super. at 463. He seemed to believe, however, that defendants as a matter of law were not barred from asserting a qualified immunity defense but on the facts could not establish that defense. Id. at 465. We note that plaintiff itself agrees *524 that appellants are entitled to assert a qualified good faith immunity defense, though in its view they did not prove it.
Preliminarily on the immunity issue we note that the lack of precision regarding the basis of liability causes us difficulties. As we have indicated we see three possible bases for liability here: delay in the decision making process; the rejection of the final application; and the delay after the approval. The first two possibilities implicate conduct of a quasi-judicial nature. The third deals with actions that are more of an administrative character. In view of our uncertainty of the basis of the trial court's decision, the fact that the judgment, even if predicated on delay after the approval, must be reversed and the circumstance that different considerations are applicable to administrative as opposed to quasi-judicial actions, we are assuming that to some degree liability was predicated on either of the first two possibilities. Thus our discussion of immunities is not intended to be applicable to appellants' conduct to the extent, if any, that the judgment is based on delay after the adoption of the resolution of November 3, 1982.
We have reviewed many cases in which claims of absolute immunity have been asserted. See, e.g., Malley v. Briggs, ___ U.S. ___, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Owen v. City of Independence, supra, 445 U.S. at 622, 100 S.Ct. at 1398, 63 L.Ed.2d at 673; Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); Cutting v. Muzzey, 724 F.2d 259 (1 Cir.1984); Reed v. Village of Shorewood, 704 F.2d 943 (7 Cir.1983). While it is not easy to reconcile these cases and apply them here, we are satisfied that appellants must be absolutely immune from plaintiff's claim, a result we reach substantially for the reasons stated in Centennial Land & Dev. Co. v. Tp. of Medford, supra, 165 N.J. Super. at 220. We do add, however, that Judge *525 Feinberg in declining to follow Centennial relied in part on the fact that in Owen v. City of Independence, supra, decided after Centennial, the Supreme Court held that municipal entities possessed no immunities under 42 U.S.C.A. § 1983. We cannot understand, however, how that decision could undermine the reasons for individuals to be personally immune as municipal liability is a burden on the public as a whole and not that of a particular person. Certainly a public official might, in the pursuit of what seems to him to be a correct result, be willing to risk public but not personal liability. Further, if a municipality itself may be liable under 42 U.S.C.A. § 1983 there is less need for individual liability. We think that persons in the position of appellants must have absolute immunity so that they are independent in carrying out their quasi-judicial decision making functions. See Butz v. Economou, supra, 438 U.S. at 509, 98 S.Ct. at 2950, 57 L.Ed.2d at 917.
In reaching our result we have considered our decision in Karnell v. Campbell, 206 N.J. Super. 81 (App.Div. 1985). There persons developing real estate brought defamation actions against objectors to the project. The trial judge granted the defendants summary judgment and the plaintiffs appealed. We affirmed the dismissal and ended our opinion with the following paragraph:
No opinion of this sort would be complete without an expression of the deep concern with which we view plaintiffs' action here. The citizens of our state must be free, within reason, to speak out on matters of public concern. So long as they state the facts implicated fairly and express their opinions, even in the most colorful and hyperbolic terms, their speech should be protected by us. Of course, developers such as plaintiffs here are entitled to invoke their legal rights in a court of law to protect their good names. We nevertheless fear that no one will be left to carry the torch of criticism even when defendants like those in this case are vindicated, after they have withstood the financial and emotional rigors of litigation such as this. Indeed it may become too costly for ordinary citizens to exercise the right of free speech which undergirds a democratic society. We are profoundly concerned with the chilling effect that plaintiffs' lawsuit in these rather unremarkable circumstances may have on other citizens who would ordinarily speak out on behalf of what they perceive to be the public good. We thus consider stringent scrutiny of claims such as plaintiffs' to be required. Like the court in Kotlikoff we are extremely `loathe to discourage that robust and uninhibited commentary on public issues that is *526 part of our national heritage.' Kotlikoff, 89 N.J. [62] at 73. [206 N.J. Super. at 94-95]
Here, unlike in Karnell v. Campbell, appellants are not private citizens. Nevertheless, they are persons who questioned the appropriateness of a real estate project. Many of the considerations we expressed in Karnell v. Campbell are valid here. We are well aware of the substantial development this State is experiencing. See Evid.R. 9(1). We think that the public interest requires that persons serving on planning boards considering applications for development act with independence and without fear that developers, who will frequently have significant financial resources and the ability to litigate, not bring them into court. The possibility of facing expensive and aggravating litigation as a result of making a decision on an application for development may in a subtle way impact on the decision making process.[9]
While we hold that appellants are absolutely immune, even if we held their immunity was only qualified we would still reverse the judgment. When a public official has a qualified immunity he is not liable for damages from conduct which does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, supra, 457 U.S. at 818, 102 S.Ct. at 2738, 73 L.Ed.2d at 410. Additionally, he will not lose his immunity if he acted in an objectively reasonable manner. Malley v. Briggs, *527 supra, 106 S.Ct. at 1096. Certainly delay could impair no rights of plaintiff as plaintiff could have refused to consent to the delay and refused to waive the 45 day rule. Then if there had been delay beyond the statutory period it would have favored plaintiff. Further, we have carefully examined the evidence and we find that appellants believed that it was in the best interests of the municipality to deny plaintiff's application. As we have already set forth in recounting their testimony, they found flaws in the plan. We have no doubt that this evidence reflected appellants' actual views.
Finally, we hold that even if appellants had been held liable for compensatory damages,[10] there is no basis in the record to hold them liable for punitive damages. The standard for liability for punitive damages in an action under 42 U.S.C.A. § 1983 is that a defendant may be held liable if he manifests a reckless or callous indifference to the constitutionally protected rights of the plaintiff, illwill or a desire to injure the plaintiff or if he manifests malice. See Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); In re Petition for Review of Opinion 552, supra, slip opinion at 9; see also Endress v. Brookdale Community College, 144 N.J. Super. 109, 145 (App. Div. 1976). Here appellants' conduct did not meet this standard. While the judge indicated it was apparent defendants were not acting with sincerity, he based this conclusion on the fact that plaintiff encountered "too many `conincidental' obstacles in their quest for site plan approval." 197 N.J. Super. at 464. In fact, as we have set forth, there were no unreasonable delays. Further, we do not see why the circumstance that plaintiff was facing obstacles established that appellants were not acting with sincerity. We have already outlined the concerns caused by this major project. It is clear that appellants were acting in what they though were the best interests of the municipality.
*528 The judgment of liability for punitive damages against appellants is reversed and the action is dismissed as to them.
NOTES
[1] The partners in plaintiff are Paul Anastasio, Marvin Greenman and Oresto Anastasio. Though in this opinion we treat plaintiff as a single entity in the partnership sense, Marvin Greenman was the active partner in the events described in this opinion.
[2] The reason we are uncertain as to the scope of the complaint is that it has not been supplied to us. We have thus relied on the pretrial order in the board's appendix but the order is somewhat cryptic.
[3] The procedural histories in the briefs do not tell us what disposition was made of the complaints against the other defendants and the judge does not dispose of the case against them in his opinion. However, it is clear that as no judgment for punitive damages was entered against them we need not deal with them individually on this appeal.
[4] The word "purd" appears in that form in the resolution.
[5] A reader of the published opinion might not realize the judge was referring to the earlier decision but the opinion of September 10, 1984 in defendants' appendices includes the words "dated June 1, 1984" after the first sentence on 197 N.J. Super. at 460 referring to the "opinion of this court." It appears that these words were deleted from the opinion as published during editing. There are certain other differences between the opinion as released to the parties and as published but they are not significant. The quotations of the opinion we include are from the published opinion.
[6] We do not approve of entering an entire opinion as a judgment.
[7] Indeed we are uncertain as to whether the compensatory damages were assessed against any board member personally, though in view of the partial settlement this does not matter. While the complaint is not clear on the issue of whether defendants were sued in their official or personal capacity the fact that punitive damages were assessed individually would indicate the action was personal. See In re Petition for Review of Opinion 552, 102 N.J. 194, 199-200 (1986).
[8] Parratt v. Taylor was partially overruled on a different point by Daniels v. Williams, supra, 474 U.S. at ___, 106 S.Ct. at 665, 88 L.Ed.2d at 668.
[9] In Spina's brief it is recited that "The only Planning Board member not named as a defendant had voted in favor of the plaintiffs' final application." The minutes of the meeting are not part of the record but this assertion is not disputed in plaintiff's brief. Further, the evidence shows that one board member did vote in favor of the application which was rejected by a seven to one vote. We note that only seven board members were named defendants. These facts support the quoted assertion. Unfortunately, this history of the case is instructive in how a board member may avoid litigation. While no doubt the dissenting member was correct, the fact remains that in a close case an affirmative vote on an application for development may, unless the board member regardless of his vote is absolutely immune for casting it, be subtly encouraged.
[10] It is unclear whether they were personally liable for the compensatory damages.