608 A.2d 1377

BERNARDSVILLE QUARRY, INC., A NEW JERSEY CORPORATION, PLAINTIFF–APPELLANT AND CROSS–RESPONDENT, v. BOROUGH OF BERNARDSVILLE, A MUNICIPAL CORPORATION,. DEFENDANT–RESPONDENT AND CROSS–APPELLANT, AND JOHN DOE AND RICHARD ROE, UNKNOWN DEFENDANTS, DEFENDANTS.

Argued February 18, 1992—Decided July 23, 1992.

*Clifford W. Starrett* argued the cause for appellant and cross-respondent (*Schenck, Price, Smith & King,* attorneys).

*Dennis Alan Cipriano* argued the cause for respondent and cross-appellant (*Gebhardt & Kiefer* and *Cipriano & Friedman,* attorneys; *Sharon Handrock Moore,* on the briefs).

The opinion of the Court was delivered by

HANDLER, J.

In this case a municipality enacted an ordinance regulating quarries. The ordinance imposed a licensing requirement for quarry operations and limited the depth below which property could not be quarried. The owner of a quarry contends that the application of the ordinance to its property effectively prohibits its use as a quarry, and therefore constitutes a governmental taking of its property. That contention poses the major issue on this appeal.

## I

Plaintiff, Bernardsville Quarry, Inc. (BQI), purchased property, referred to as the Ferrante Quarry, located in the Borough of Bernardsville (Bernardsville, borough, or municipality), for $3,825,000 at a foreclosure sale on March 2, 1987. The land had been used as a quarry since 1931. The rock formation of the quarry consists of basalt trap rock formations. In addition to quarrying, the owner also used property to crush stone and to produce bituminous concrete.

Bernardsville adopted its first land-use ordinance in 1949. In 1963, the quarry operation was declared a nonconforming use by the Superior Court, subject to limitations stipulated to by the owner. The owner continued to operate the quarry until 1985, when economic problems forced him to stop quarrying and crushing stone. The bituminous concrete facility was shut down in 1986.

Following the owner's bankruptcy, BQI acquired the property and applied to the Borough for a Continued Certificate of Occupancy (CCO), stating its intention to continue to use the property to quarry and process stone as had its prior owner. In a letter dated March 11, 1987, the borough denied the application. The stated reasons were that the only current use of the property was as a bituminous concrete plant and not a quarry, that BQI had failed to submit a site plan as required by Bernardsville's Land Use Ordinance, and a number of serious environmental concerns, including the potential for pollution of subsurface aquifers from which drinking water is drawn. The borough's fear of pollution was based on its belief that parts of the land had been used, illegally, for asphalt production, as a transfer station for consolidating garbage, and as a landfill containing machine parts leaking contaminants.

The borough council discussed the quarry situation a number of times between March 1987 and April 1988. The borough issued BQI a Temporary Certificate of Occupancy (TCO) on June 23, 1987, providing only for the operation of the concrete

plant. However, BQI furnished additional information through outside consultants, and on July 20, 1987, Bernardsville issued a second TCO permitting the crushing of loose stone and a limited amount of blasting. At the same meeting at which the borough granted the second TCO, it also adopted a new ordinance, referred to as the Quarry Licensing Ordinance. The ordinance limits the depth of quarrying operations, restricts hours of operation, requires buffer zones, and imposes a license requirement. The second TCO was made contingent on BQI's filing an application in compliance with the new ordinance.

Thereafter, on August 4, 1987, the borough ordered the suspension of all blasting at the quarry. That action was based on a determination by the borough's engineers that at some time in the past asbestos had been disposed of on the property.

BQI filed a detailed application for a quarry license on February 29, 1988, in which it sought authorization to quarry below the level allowed by the quarry ordinance and in areas in which quarrying was prohibited by both the ordinance and the limitations contained in the 1963 judgment. BQI's request would expand and deepen the quarry pit so that it would extend over approximately forty-five acres and have a floor at seventy-five feet above sea level. The removal of stone would take twenty years and would create a lake of almost forty-five acres with an average depth of over two-hundred feet. The distance from the top of the quarry area to the floor of the lake would be approximately three hundred and seventy-five feet, one hundred and seventy-five feet from the top of the cliff face to the lake itself.

The borough formally adopted a resolution denying BQI's application, without prejudice, on April 11, 1988. It gave several reasons for the denial, including: the violation of the limitations set in the 1963 nonconforming use judgment; the asbestos contamination; the finding by the New Jersey Department of Environmental Protection that BQI's surface-water discharge plan was unacceptable, as were the number and depth of

monitor wells; failure to provide sufficient rock mass information; failure to guarantee compliance with the New Jersey Pollution Discharge Elimination System permit; failure to evaluate groundwater flow; and failure to provide hydrogeologic characterization for the development of a database for groundwater monitoring wells.

BQI filed a complaint in lieu of prerogative writ on May 25, 1988. The multi-count complaint included allegations that the Quarry Licensing Ordinance was invalid because several of its conditions on quarry operations were unreasonable, and, in particular, its depth restrictions effected an unconstitutional taking of property. It also alleged that the borough could not validly require licenses for quarrying and that the denial of the license in this case was improper. The complaint also charged that the borough had acted with "unclean hands," that the ordinance had not been lawfully passed, and that the acts of the borough constituted a violation of federal civil rights under 42 *U.S.C.* § 1983.

After an eleven-week trial, the trial court in an unreported opinion ruled against BQI on its challenge to the depth limitation provision of Bernardsville's Quarry Licensing Ordinance, concluding that the ordinance had effected no unconstitutional taking. The court also ruled that licensing of quarries was within the scope of a municipality's authority and that the denial of a Certificate of Occupancy was valid. It further determined that BQI was time barred from alleging a violation of the Open Public Meetings Act. The court ruled, however, that the ordinance's limitation on the quarry's hours of operation was invalid and that the borough's denial of BQI's application was arbitrary and capricious in that it was based on an inadequate record. The court remanded the application to the borough council for reconsideration of BQI's application.

On appeal, the Appellate Division in an unreported opinion affirmed the trial court's decision. It slightly modified the

decision to allow BQI to file a revised application instead of requiring Bernardsville to reevaluate the former one.

This Court granted the petition and cross-petition for certification filed by the respective parties. 127 *N.J.* 545, 606 *A.*2d 360 (1991).

## II

We deal first with the general power of a municipality to license and regulate the operations of quarries.

■ BQI concedes that municipalities have the general authority to regulate quarries pursuant to the State's grant of police power in *N.J.S.A.* 40:48–1 and –2. It argues, however, that a municipality does not have the specific power to license a quarry. BQI contends that a municipality's power to license businesses derives only from *N.J.S.A.* 40:52–1, and quarries are not enumerated as an activity subject to licensure nor are they similar to the types of businesses contemplated by that statute.[1]

■■ A municipality may require a license in order to help it regulate under its general police power. In *Daniels v. Point Pleasant,* 23 *N.J.* 357, 129 *A.*2d 265 (1957), this Court observed that "[i]nherent in the power to regulate and control is the power to charge *license fees* primarily to defray the costs of

---

[1]*N.J.S.A.* 40:52–1 states:

   The governing body may make, amend, repeal and enforce ordinances to license and regulate:

\* \* \* \* \* \* \* \*

   g. Lumber and coal yards, stores for the sale of meats, groceries and provisions, dry goods and merchandise, and goods and chattels of every kind, and all other kinds of business conducted in the municipality other than herein mentioned, and the places and premises in or at which the business is conducted and carried on.

   Nothing in this chapter contained shall be construed to authorize or empower the governing body of any municipality to license or regulate any person holding a license or certificate issued by any department, board, commission, or other agency of the State.

such control." *Id.* at 361, 129 *A.*2d 265; *see also Middletown Township v. Storer Cable Communications,* 206 *N.J.Super.* 572, 503 *A.*2d 357 (App.Div.1985) (recognizing that municipality may apply license fees to defray costs and expenses collected during performance of regulatory authority). The fees generated by licenses must be related to regulatory expenditures and may exceed regulatory costs only within reasonable limits. *Automatic Merchandising Council v. Township of Edison,* 102 *N.J.* 125, 506 *A.*2d 352 (1986).

■ *N.J.S.A.* 40:52–1 is simply a grant of power allowing municipalities to use licenses ancillary to its powers to regulate. *See Holmdel Builders v. Township of Holmdel,* 232 *N.J.Super.* 182, 192, 556 *A.*2d 1236 (App.Div.1989). The trial court here found that *N.J.S.A.* 40:52–1g expressly authorizes municipalities to enact and enforce ordinances to license and regulate both specifically enumerated businesses and activities and "all other kinds of business conducted in the municipality other than herein mentioned" and that quarries should be treated as a type of business subject to license fees. The Appellate Division agreed with the trial court that *N.J.S.A.* 40:52–1g grants municipalities the power to license. It found that "[t]he authority to license ... goes hand-in-hand with the authority to regulate," citing *Salomon v. Jersey City,* 12 *N.J.* 379, 388, 97 *A.*2d 405 (1953).

The cases cited by BQI to support its contention that the license requirement is *ultra vires* involve municipal attempts to use licenses as a means of raising revenues or are unrelated to proper regulatory concerns. *See, e.g., Absecon v. Vettese,* 13 *N.J.* 581, 588, 100 *A.*2d 750 (1953) (recognizing that municipality lacks power to impose licensing fees on the "privilege of publishing newspapers"). The distinction was pointed out in *Nelson Cooney & Sons v. Township of South Harrison,* 57 *N.J.* 384, 273 *A.*2d 33 (1971):

> *N.J.S.A.* 40:52–1 covers a large number of business and instrumentalities used therein as the permitted subjects of municipal licenses. Essentially all are also proper subjects for police power regulatory ordinances, authorized by *N.J.S.A.*

40:48–1 and 2. But the latter power does not include the right to require a license; and the inherent right to charge a fee in connection with a purely regulatory non-licensing ordinance has been said to be limited to an amount primarily designed to defray the costs of regulation. [*Id.* at 390 n. 4, 273 *A.*2d 33.]

Similarly, in *Salomon v. Jersey City, supra,* 12 *N.J.* 379, 97 *A.*2d 405, the Court determined that the licensing ordinance was enacted solely for the purpose of raising revenues, not for the purpose of regulation. However, the Court determined that the

primary and overriding purpose of the Legislature in enacting [*N.J.S.A.* ] 40:52–1 and [*N.J.S.A.* ] 40:52–2 was to authorize municipalities to license and regulate, as police measures for the public health, safety, morals or welfare, the local businesses described therein, and only incidentally to impose on the business thus licensed and regulated license fees for revenue which may, at least within reasonable limits, exceed the regulatory costs. [*Id.* 57 *N.J.* at 390, 273 *A.*2d 33.]

■ Finally, BQI contends that the requirement that it be registered under the State's Mine Safety Act, *N.J.S.A.* 34:6–98.4, preempts any attempt to license by Bernardsville. The Mine Safety Act is essentially concerned with the safety of mine and quarry workers. *See Mayor of South Brunswick v. Covino,* 142 *N.J.Super.* 493, 497, 362 *A.*2d 51 (App.Div.1976). Because there is no clear indication that the Legislature intended to prevent municipalities from regulating and incidentally licensing quarries for the health, safety, and welfare of the community, the field is not preempted. *Id.* at 498, 362 *A.*2d 51 (citing *Kennedy v. Newark,* 29 *N.J.* 178, 187, 148 *A.*2d 473 (1959)). Consequently, there is no statutory basis on which to infer that the State has preempted the field of quarrying or has effectively precluded local regulations of quarrying operations. We thus conclude that a municipality has the power to require licenses to authorize the operation of certain kinds of activities as an aspect of its regulatory authority over such activities. We are satisfied that the municipality had the power to enact the Quarry Licensing Ordinance and to require the licensing of quarries as an aspect of its regulation of quarries.

## III

Under our constitutions, federal and state, government cannot take private property without paying just compensation. "The protections afforded under both constitutions, [article I, paragraph 26 of the New Jersey Constitution and the Fifth and Fourteenth Amendments to the United States Constitution] are coextensive." *Littman v. Gimello*, 115 *N.J.* 154, 161, 557 *A.*2d 314, *cert. denied*, 493 *U.S.* 934, 110 *S.Ct.* 324, 107 *L.Ed.*2d 314 (1989).

Without question private property can be effectively taken by government through regulatory measures that do not amount to physical occupation or appropriation. *E.g., Schiavone Constr. Co. v. Hackensack*, 98 *N.J.* 258, 263–64, 486 *A.*2d 330 (1985) (holding restrictions on land use short of total appropriation may constitute taking if sufficiently extensive and prolonged; such restrictions on development of land as opposed to outright appropriation constitute a compensable taking dependent on facts of each case); *Washington Market Enterprises v. Trenton*, 68 *N.J.* 107, 343 *A.*2d 408 (1975) (nonphysical takings may be recompensed). However, "[t]he clearest example of a taking is a situation in which property is physically invaded." *Littman v. Gimello, supra*, 115 *N.J.* at 161, 557 *A.*2d 314. The physical occupation or appropriation of private property by government most directly and obviously implicates the constitutional obligation to pay just compensation for the taking of property without due process of law. *E.g., Loretto v. Teleprompter Manhattan CATV Corp.*, 458 *U.S.* 419, 436, 102 *S.Ct.* 3164, 3176, 73 *L.Ed.*2d 868, 882–83 (1982) (holding that permanent physical occupations were takings *per se*, without regard to public interests served; owner suffers a special kind of injury when another invades and occupies his or her property). The interference with property interests that results from regulatory measures do not so obviously constitute the taking of property. "A 'taking' may more readily be found when the interference with property can be characterized

as a physical invasion by government ... than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central Transp. Co. v. City of New York,* 438 *U.S.* 104, 124, 98 *S.Ct.* 2646, 2659, 57 *L.Ed.*2d 631, 648 (1978) (*Penn Central*); *see Nollan v. California Coastal Commn.,* 483 *U.S.* 825, 107 *S.Ct.* 3141, 97 *L.Ed.*2d 677 (1987).

■ Regulatory takings are generally too fact-sensitive to be governed by a single, all-inclusive rule. "[T]here is no precise formula that courts use to determine whether a compensable 'noninvasive' taking has occurred." *Littman v. Gimello, supra,* 115 *N.J.* at 162, 557 *A.*2d 314. Thus, the United States Supreme Court has

> eschewed the development of any set takings formula for identifying a "taking" forbidden by the Fifth Amendment, and [has] relied instead on ad hoc, factual inquiries into the circumstances of each particular case.... To aid in this determination, however, [it has] identified three factors which have "particular significance": (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." [*Connolly v. Pension Benefit Guaranty Corp.,* 475 *U.S.* 211, 224, 225, 106 *S.Ct.* 1018, 1026, 89 *L.Ed.*2d 166, 178, 179 (1986) (citations omitted).]

The determination of whether a regulatory measure effectuates the taking of property requires a multifactor balancing test that serves to weigh the public interest in enacting the regulation against private property interests affected by it. *Keystone Coal v. DeBenedictis,* 480 *U.S.* 470, 107 *S.Ct.* 1232, 94 *L.Ed.*2d 472 (1987) (*Keystone*).

In *Gardner v. New Jersey Pinelands Commission,* 125 *N.J.* 193, 593 *A.*2d 251 (1991), we recently reviewed the law governing such regulatory takings and recognized the different factors that can complicate the issue of whether the governmental regulation of private property effectuates a taking requiring the payment of just compensation, and the different considerations that bear on the determination of that issue:

> In its most general formulation, takings analysis makes two fundamental demands of any zoning scheme: it must substantially advance legitimate state interests, and it cannot deny an owner all economically viable use of the land.

*Agins v. Tiburon*, 447 *U.S.* 255, 260, 100 *S.Ct.* 2138, 2141, 65 *L.Ed.*2d 106, 112 (1980). Those demands may become more elaborate when takings analysis is applied to complex, special-purpose regulations. The public purpose of the regulation may consist of the furtherance of a "public function" or the prohibition of particular uses that are inimical to the public welfare. The economic effect of the regulatory scheme can be assessed in terms of the adjustment of economic benefits and burdens or the extent of interference with "distinct investment-backed expectations." *Penn Central [Transp. Co. v. City of New York ]*, 438 *U.S.* 104, 124–28, 98 *S.Ct.* 2646, 2659–61, 57 *L.Ed.*2d 631, 648–51 (1978). . . . Essentially, then, application of takings principles requires a fact-sensitive examination of the regulatory scheme, focusing on whether it substantially advances a legitimate public purpose and whether it excessively interferes with property rights and interests. [*Id.* 125 *N.J.* at 205, 593 *A.*2d 251.]

This case involves a regulatory taking. It impels the Court, as stated in *Gardner*, to determine whether the regulatory scheme "substantially advances a legitimate public purpose and whether it excessively interferes with property rights and interests." *Ibid.* Hence, the initial focus in that inquiry must be on the public purpose of the governmental action and how it is advanced by that action.

*Keystone* is instructive on that point. There the Commonwealth of Pennsylvania enacted statutory mining regulations that required certain amounts of coal to be left in the ground in order to prevent coal mine subsidence that often caused substantial damages to buildings resting above the mines, and posed environmental hazards and physical conditions that would render land impossible to develop. 480 *U.S.* at 473–74, 107 *S.Ct.* at 1236–37, 94 *L.Ed.*2d at 481–82. The Supreme Court acknowledged that the legislation provided "for the conservation of surface land areas affected by the mining of coal" and that it had been enacted pursuant to the State's "police powers" for the protection of the "health, safety and general welfare of the people of the Commonwealth." *Id.* at 481–85, 107 *S.Ct.* at 1239–41, 94 *L.Ed.*2d at 485–87. The Court accepted the interpretation of the lower courts that the governmental purposes set forth in the legislation were "genuine, substantial, and legitimate." *Id.* at 486, 107 *S.Ct.* at 1242, 94 *L.Ed.*2d at 489. Accordingly, it concluded that the Commonwealth had acted "to

protect the public interest in health, the environment, and the fiscal integrity of the area," and that the statutory regulation "plainly seeks to further such an interest." *Id.* at 488, 107 *S.Ct.* at 1243, 94 *L.Ed.*2d at 490.

■ In this case, the ordinance was passed to meet environmental, safety, and public health and welfare concerns. The ordinance declares that its purpose is "to protect the environment by minimizing air pollution and prevent surface and substance water pollution." Bernardsville, N.J., Ordinance 770 (July 20, 1987). The limitations imposed by the ordinance were designed "for the protection of persons and property and for the preservation of the public health, safety and welfare of the Borough." *Ibid.* The trial court explained the factors that justified the regulatory measure:

> Few communities are ever confronted with the need to deal with a use of its property involving such extreme violence to the topography. The divergence of opinion by so many experts, all of whom were passionate in the defense of their positions, demonstrates the inability of a governing body to predict with certainty the effect of the removal of so much stone. Under the circumstances, I find the Borough has demonstrated "the existence of a sufficient public need to justify the depth limitation provision of the Quarry Licensing Ordinance." (citation omitted).

In upholding the legitimacy of the public purpose of the ordinance, the trial court cited *Dock Watch Hollow Quarry Pit v. Township of Warren,* 142 *N.J.Super.* 103, 361 *A.*2d 12 (App.Div.1976), *aff'd o.b.,* 74 *N.J.* 312, 377 *A.*2d 1201 (1977) (*Dock Watch*), which, according to the trial court, recognized the hazards, such as "pollution of the ground water supply," that accompany quarrying to an "unlimited depth." The trial court thus found "a compelling need under almost identical circumstances" to justify the borough's regulation prohibiting quarry operations below certain depths. The Appellate Division similarly concluded that there was sufficient evidence that quarrying would cause grave environmental harm and create substantial risks to the public safety, health, and welfare.

That the proposed quarrying operation was reasonably determined on adequate evidence to be a threat to the environment

and inimical to the public welfare is beyond doubt. The borough's expert noted the "potential of surface pollution through careless deposits of oil or other pollutants during quarry operations." Moreover, the court found that the evidence established a connection between water in the quarry and water in the subterranean aquifers and a substantial risk of exposure of these aquifers to potential pollutants that could exist in the proposed lake: "[T]he substantial enlargement of the pit will carry the penetration into the aquifer to a depth one hundred and fifty (150) feet deeper over an area approximately three times as large." Considerable testimony focused on the potential risks of pollution from the remnants of the illegal landfill and the transfer station that were present on the property prior to BQI's acquisition.

Moreover, one could reasonably determine from the record that there existed a genuine risk of asbestos contamination from the effects of stone-blasting because asbestos had been dumped on the property prior to BQI's acquisition. In its application, BQI noted that an expert survey revealed that thirty-six mounds of soil on the property contained chrysotile asbestos in concentrations ranging from 5% to 45%. The borough's expert reports revealed the existence of further deposits on the site. Although BQI experts testified that blasting would not increase the risk of exposure, the borough was reasonably concerned about the environmental hazards of asbestos released into the air.

Additionally, the borough considered the effect of the quarry pit on the safety and general welfare of its citizens. The trial court observed that the quarry resembled "the scene from a distant planet," and that the proposed quarry is "mammoth". It thus found persuasive the borough's concern that the depth of the lake and the height of the cliffs will make the site "difficult to police and will constitute an attractive nuisance." Similarly, in *Dock Watch, supra,* plaintiffs sued the municipality in order to quarry below grade to a depth exceeding one-hundred and fifty feet and within areas comprising the buffer

zone. The Appellate Division there found that "[t]he hazards and dangers attendant such condition on the land are well known and of considerable concern." 142 *N.J.Super.* at 125, 361 *A.*2d 12.

*Keystone* recognized that a State does not effectuate a taking without due process and need not provide compensation when it diminishes or destroys the value of property by stopping illegal or harmful activity or abating a public nuisance. Thus, "the public interest in preventing activities similar to public nuisances is a substantial one, which in many instances has not required compensation." 480 *U.S.* at 492, 107 *S.Ct.* at 1246, 94 *L.Ed.* at 493; *see also Mugler v. Kansas,* 123 *U.S.* 623, 668–69, 8 *S.Ct.* 273, 300–01, 31 *L.Ed.* 205, 213 (1887) (noting that a "prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or appropriation of property"); *Miller v. Schoene,* 276 *U.S.* 272, 280, 48 *S.Ct.* 246, 248, 72 *L.Ed.* 568, 571 (1928) (holding that Takings Clause did not require Virginia to compensate cedar tree owners for value of trees destroyed by state in order to prevent disease from spreading to nearby apple orchards, a more valuable resource); *Hadacheck v. Sebastian,* 239 *U.S.* 394, 36 *S.Ct.* 143, 60 *L.Ed.* 348 (1915) (halting factory emissions). Consequently, even though the quarrying of property may not be unlawful as such or, indeed, constitute an actual nuisance, it can have harmful impacts on the public welfare, sufficient to justify a protective governmental response to limit, reduce or even prevent such activity. *See Goldblatt v. Town of Hempstead,* 369 *U.S.* 590, 82 *S.Ct.* 987, 8 *L.Ed.*2d 130 (1962) (finding that local government may prohibit soil excavation use in order to protect public welfare); *Dock Watch, supra,* 142 *N.J.Super.* at 125, 361 *A.*2d 12 (same applied to rock quarry); *cf. Lucas v. South Carolina Coastal Council,* —— *U.S.* ——, 112 *S.Ct.* 2886, 120 *L.Ed.*2d 798 (1992) (recognizing that nuisance exception to takings clause that may authorize government to directly prohibit bene-

ficial uses owned by property owner was found not applicable to regulation designed to protect beaches and dunes from erosion by prohibiting construction along beach).

BQI's status as an owner of property governed by a nonconforming use does not alter the takings analysis. Although a nonconforming use protects a property owner against subsequent zoning restrictions, it clearly does not prevent a municipality from regulating the land, pursuant to its police power, in the public interest. As stated in *Dock Watch, supra,* "[n]onconforming uses are clearly subject to such police power regulations, including those designed for the preservation of the environment and the protection of ecological values." 142 *N.J.Super.* at 117, 361 *A.*2d 12.

The police power is fully responsive to the threats and risks posed to the public and the environment from particular uses of land. In *Gardner,* we recognized the many settings in which the police powers of government can be invoked.

The health, safety and morals or general welfare may be promoted by prohibiting certain uses of land. *See Penn Central, supra,* 438 *U.S.* at 125–27, 98 *S.Ct.* at 2659–61, 57 *L.Ed.*2d at 649–50; *see also Keystone Bituminous Coal v. DeBenedictis,* 480 *U.S.* 470, 107 *S.Ct.* 1232, 94 *L.Ed.*2d 472 (1987) (upholding restrictions against removal of coal to prevent mine subsidence); *Goldblatt v. Town of Hempstead,* 369 *U.S.* 590, 82 *S.Ct.* 987, 8 *L.Ed.*2d 130 (1962) (upholding ordinance prohibiting excavation within two feet of groundwater level); *Miller v. Schoene,* 276 *U.S.* 272, 48 *S.Ct.* 246, 72 *L.Ed.* 568 (1928) (upholding destruction of disease-carrying cedar trees to protect apple orchards). The prevention of damage to the environment constitutes a particularly strong justification for prohibiting inimical uses. *E.g., New Jersey Sports & Exposition Auth. v. McCrane,* 61 *N.J.* 1, 63, 292 *A.*2d 545 (1972) (Hall, J., concurring) ("we must also thoroughly respect the balance of nature"); *Texas E. Transmission Corp. v. Wildlife Preserves, Inc.,* 48 *N.J.* 261, 268, 225 *A.*2d 130 (1966) (government conservation of natural resources serves a legitimate public purpose); *Usdin v. Environmental Protection Dep't,* 173 *N.J.Super.* 311, 329, 414 *A.*2d 280 (Law Div.1980) ("No longer are we able to afford the luxury of squandering nature or indiscriminate over-development * * *."), *aff'd,* 179 *N.J.Super.* 113, 430 *A.*2d 949 (App.Div.1981). A property owner "has no absolute and unlimited right to change the essential natural character of his land so as to use it for a purpose for which it was unsuited in its natural state and which injures the rights of others," *Usdin, supra,* 173 *N.J.Super.* at 327, 414 *A.*2d 280 (citation omitted); *accord Penn Central, supra,* 438 *U.S.* at 144–45, 98 S.Ct. at 2669–70, 57 *L.Ed.*2d at 661–62 (Rehnquist, J., dissenting); *New Jersey Builders Ass'n v.*

*Department of Envtl. Protection,* 169 *N.J.Super.* 76, 96–97, 404 *A.*2d 320 (App.Div.), *certif. denied,* 81 *N.J.* 402, 408 *A.*2d 796 (1979). [125 *N.J.* at 207–08, 593 *A.*2d 251.]

In this case, the evidence amply demonstrated a reasonable basis for the borough to believe that the operations of the quarry below the permissible level would create genuine and substantial risks of harm to the public in general and to the environment in particular. The courts below soundly determined that those risks of harm were sufficient and, in the words of *Keystone,* the borough clearly acted "in preventing activities similar to public nuisances." 480 *U.S.* at 492, 107 *S.Ct.* at 1264, 94 *L.Ed.*2d at 493. We thus conclude that the ordinance advanced a valid public purpose.

The second major inquiry concerns whether the interference with property is so excessive as to require just compensation. That issue, in the context of a regulatory taking, can be particularly complex and fact-sensitive. We dealt with this aspect of takings law in *Gardner*:

> The critical remaining question is whether the regulations impair to an impermissible degree valuable property rights and interests. Diminution of land value itself does not constitute a taking. Similarly, impairment of the marketability of land alone does not effect a taking. Also, restrictions on uses do not necessarily result in takings even though they reduce income or profits. A regulatory scheme will be upheld unless it denies "all practical use" of property, or "substantially destroys the beneficial use of private property," or does not allow an "adequate" or "just and reasonable" return on investment. [125 *N.J.* at 210–11, 593 *A.*2d 251 (citations omitted).]

BQI contends that the regulatory action of the borough effects a taking of property because of the extent of its economic loss attributable to the ordinance's prohibition. Several experts testified during trial on the actual value of the property. The trial court found that if not allowed to be quarried below the depth set in the ordinance, the property still had value of "substantially more than ... $2,700,000." The Appellate Division also found that even if the value of the property is only $2,700,000 with the depth limitation, the property still retains substantial value (citing as cases in which no taking was found: *Hadacheck v. Sebastian, supra,* 239 *U.S.* at

410–11, 36 *S.Ct.* at 145, 60 *L.Ed.* at 356 (permitting reduction from $800,000 to $60,000); *Pace Resources, Inc. v. Shrewsbury*, 808 *F.*2d 1023, 1031 (3d Cir.1987) (permitting reduction from $495,600 to $52,000), *cert. denied*, 482 *U.S.* 906, 107 *S.Ct.* 2482, 96 *L.Ed.*2d 375 (1987); *Ketchel v. Bainbridge Township*, 52 Ohio St.3d 239, 557 *N.E.*2d 779, 784 (1990) (permitting reduction from $1,333,000 to $61,000)).

BQI's expert on real estate valuation testified that the property was worth over $34,000,000 based on a projection that over 10,000,000 metric tons of basalt could be mined from the property. BQI admits, however, that even if the depth restriction is upheld, the property would still have a value of $2,700,000. As observed in *Goldblatt v. Town of Hempstead, supra*, 369 *U.S.* 590, 82 *S.Ct.* 987, 8 *L.Ed.*2d 130, the Supreme Court upheld a ban on sand and gravel excavations below two feet above the maximum groundwater level. It noted that "there is no evidence in the present record which even remotely suggests that prohibition of further mining will reduce the value of the lot in question." *Id.* at 594, 82 *S.Ct.* at 990, 8 *L.Ed.*2d at 134. In *Gardner*, we similarly concluded that a substantial diminution in property value did not constitute a sufficient loss of value or deprivation of property to require the payment of compensation. 125 *N.J.* at 210–11, 593 *A.*2d 251.

BQI stresses that the ordinance in practical effect denies it the ability to engage in quarry operations at all, clearly the economically-optimum use of the property. In that respect its situation differs from those in *Keystone* and *Dock Watch*, in which the property owners were simply limited but not barred from continued operations. In *Gardner*, however, we emphasized that a regulatory measure will not effect a taking "unless it denies 'all practical use' of property or 'substantially destroys [its] beneficial use.'" 125 *N.J.* at 211, 593 *A.*2d 251 (citations omitted). In *Goldblatt v. Town of Hempstead, supra*, 369 *U.S.* 590, 82 *S.Ct.* 987, 8 *L.Ed.*2d 130, the Supreme Court upheld the regulation that barred any continued excavation because it

found that the property could still be put to other viable economic uses.

The trial court here found that the property could continue to be used for the production of blacktop and concrete and could generate "significant revenue" as the site of a telephone tower, and might even be used for an office complex. Furthermore, BQI's expert testified that the property could be used for residential purposes. BQI's property clearly retains substantial value and may be put to other economically-viable uses.

Related to the claim that it will suffer a substantial economic loss and be denied its quarry use is BQI's contention that the regulation deprives it of "distinct investment backed expectations." That claim in a sense overlaps BQI's additional claim that the profitability of its property has been drastically reduced by the regulatory ban on quarrying.

The Supreme Court in *Penn Central* noted that the property owner's investment could be a relevant consideration in a takings inquiry:

> In engaging in these ad hoc factual inquiries, the Court's decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment backed expectations, are of course, relevant considerations. [438 *U.S.* at 124, 98 *S.Ct.* at 2659, 57 *L.Ed.*2d at 648.]

One aspect of the relevance of investment-backed expectations as a factor relates generally to "whether the claimant reasonably relied to her economic detriment on an expectation that the government would not act as it did—that is, would not deprive her of the property at issue." Andrea L. Peterson, *The Takings Clause: In Search of Underlying Principles: Part I—A Critique of Current Takings Clause Doctrine*, 77 *Cal. L.Rev.* 1301, 1320 (1989). Reliance is not necessarily the focus of the test, but rather whether the regulation permits the claimant to make reasonable use of his or her property. *Ibid.*

In the present case, plaintiff has not demonstrated that its expectation that it would be able to quarry over 10,000,000 metric tons without being subject to significant governmental

restrictions was itself realistic or reasonable. A quarrying operation is one that generally can cause severe impacts on surrounding properties and the environment, and significantly affect the public interest. *E.g., Dock Watch, supra,* 142 *N.J.Super.* at 125–26, 361 *A.*2d 12; *see Keystone,* 480 *U.S.* at 488, 107 *S.Ct.* at 1243, 94 *L.Ed.*2d at 490. Moreover, the record reveals the president of BQI had previously been involved in another litigation concerning a licensing ordinance affecting the use of property as a quarry, and, presumably, was aware that its quarrying operations could be subject to significant limitations. As recently observed by the United States Supreme Court: "It seems to us that the property owner necessarily expects the use of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police power." *See Lucas, supra,* —— *U.S.* ——, 112 *S.Ct.* 2886, 120 *L.Ed.*2d 798 (1992). In other situations in which government regulatory activity could not have been readily predicted or foreseen, the resulting economic constraints on property owners were not considered to be excessive or unreasonable. *See, e.g., Littman v. Gimello, supra,* 115 *N.J.* at 164, 557 *A.*2d 314 (designation of plaintiff's property as a hazardous waste facility resulting in "lost economic opportunities, foregone financing, and diminution in market value arising from government plans, and their attendant publicity do not alone give rise to a compensable taking."). Thus, the borough in the legitimate exercise of its police powers could reasonably be expected to require needed restrictions that would control the continued quarry operations of the property in the public interest.

Another aspect of the test for investment-backed expectations addresses the actual connection between the investment and the specific regulatory interference with the use of property. *Penn Central, supra,* 438 *U.S.* at 127–28, 98 *S.Ct.* at 2660–61, 57 *L.Ed.*2d at 650–51. That focus is on the particular interest that is purchased to determine the scope of the investment and the effect of the regulation on that investment. The

evidence of record fails to establish a definite economic nexus between BQI's investment and the restrictions on the quarry. It is true that BQI's purchase of the property was undoubtedly motivated by the expectation of engaging in a lucrative quarry operation. However, BQI did not merely acquire a quarry—it purchased a large tract of land that had been used as a quarry, as well as for several other commercial and economic purposes. Further, when BQI first acquired the site, the property had a number of substantial improvements, including processing equipment, an access and distribution control center, roadway networks, lighting, fencing, and on-site utilities. It thus appears that BQI's investment of $9,000,000, composed of the purchase price, the cost of clean-up, and the purchase of new equipment, was referable to the property and its improvements as a whole and its capacity to be put to multipurpose uses. The evidence does not establish that the investment in the property made by BQI was referable only to the acquisition of a quarry as such or based exclusively on BQI's anticipated quarrying operations alone.

Moreover, it is not clear that BQI will likely lose its investment as a result of the municipal regulations. Since its acquisition of the property in 1987, commercial activities have occurred on the BQI site. Those include stone crushing and ripping activities, the production of bituminous and ready mix concrete and a communications tower. BQI owns the leases on the ready mix concrete plant and the tower. Those commercial activities produced gross revenues in excess of $2,000,000 during 1987. The evidence also suggests other viable sources of potential revenues. For example, the existing faces of the quarry cliff were capable of being mined. BQI's own expert conceded that the value of those existing features and improvements were substantial, aside from the use of the property as quarry.

In *Gardner*, we pointed out that regulatory restrictions do not result in taking even though they reduce income or profits provided they "allow an 'adequate' or 'just and reasonable'

return on investment." 125 *N.J.* at 210–11, 593 *A.*2d 251. In *Keystone* the Supreme Court noted that despite the amount of coal lost by regulation, there was sufficient coal reserved for the companies. The coal companies were required by the statute to leave 1.8 percent of their coal in the ground, and only about seventy-five percent of the coal companies' coal could be profitably mined in any event. The Court found "no showing that petitioners' reasonable 'investment-backed expectations' have been materially affected by the additional duty to retain the small percentage that must be used to support the structures protected by [section] 4." 480 *U.S.* at 499, 107 *S.Ct.* at 1249, 94 *L.Ed.*2d at 497. Similarly, in *Dock Watch,* we upheld the determination of the Appellate Division which found that a municipal ordinance which limited the permissible depth of quarrying to the lowest grade of the adjoining properties did not result in an unconstitutional taking despite the significant impairment of the property owner's investment. 142 *N.J.Super.* at 125–28, 361 *A.*2d 12. There, the owner's investment was substantial, $2,000,000, compared to BQI's $9,000,000; the amount of stone that the owner would be unable to reach was significant in both cases as well, 10,287,00 tons (with a value of $26,000,000) in *Dock Watch* and 11,000,000 tons (with a value of possibly as much as $34,000,000) in the present case. In this case, however, as already noted, the investment was not shown to be referable exclusively to the quarry, and other actual and potential profitable uses of the property remain.

We are thus satisfied that BQI's economic losses are not so substantial and the restrictions on uses are not so extensive as to constitute a confiscatory taking of its property.

BQI further contends that its economic loss is compensable because it has been deprived of a separate estate or interest in property. It asserts that the prohibition against the removal of stone from its property is the loss of a distinct property interest.

In *Penn Central, supra,* 438 *U.S.* 104, 98 *S.Ct.* 2646, 57 *L.Ed.*2d 631, the Supreme Court upheld a municipal regulation

that prevented the use of air space above Grand Central Terminal. Plaintiffs had entered into a business transaction with a company to construct a multi-story office building in the air space above the terminal. The Supreme Court rejected plaintiff's claim. It noted that when enacted for the purpose of protecting the health, safety, or general welfare of the public, the Court "has upheld land-use regulations that destroyed or adversely affected recognized real property interests." *Id.* at 125, 98 *S.Ct.* at 2659, 57 *L.Ed.*2d at 648. With respect to that analysis, we observed in *Gardner* that the Supreme Court's "takings jurisprudence focused on the nature and extent of interference with rights in the whole parcel, not discrete segments." 125 *N.J.* at 212, 593 *A.*2d 251. In *Andrus v. Allard*, 444 *U.S.* 51, 65–66, 100 *S.Ct.* 318, 327, 62 *L.Ed.*2d 210, 223 (1979), the Court noted that "where an owner possess a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking because the aggregate must be viewed in its entirety."

The issue was also considered by the Supreme Court in *Keystone.* There, it noted, Pennsylvania property law recognizes three separate and distinct estates in land—the surface, the mineral, and the right of surface support. The Court ruled that it would not be bound by state law property distinctions in determining the extent to which a regulation economically affects a landowner. "It is clear, however, that our takings jurisprudence forecloses reliance on such legalistic distinctions within a bundle of property rights." 480 *U.S.* at 500, 107 *S.Ct.* at 1250, 94 *L.Ed.*2d at 498.

On this point, BQI claims that *Whitney Benefits, Inc. v. United States*, 752 *F.*2d 1554 (Fed.Cir.1985), *remanded*, 926 *F.*2d 1169 (1991) (*Whitney* II), *cert. denied*, —— *U.S.* ——, 112 *S.Ct.* 406, 116 *L.Ed.*2d 354 (1991), supports its position. The court in *Whitney* II found that the right to mine coal deposits is a property right and that the Act effectuated a taking since its prohibition on mining totally destroyed that property right. *Id.*

at 1174, 1176. *Whitney* II relies on language in *Keystone* that "a regulation effects a taking if it *either* (1) 'does not substantially advance legitimate state interests,' *or* (2) 'denies an owner economically viable use of his land.'" *Whitney* II, 926 *F.*2d at 1176 (citing *Keystone*, 480 *U.S.* at 485, 107 *S.Ct.* at 1232–34, 94 *L.Ed.*2d at 488 (citations omitted)). The court in *Whitney II*, however, disregarded the specific reference *Keystone* makes to *land* and not to *property*, and that the effect of the *Keystone* decision was to uphold a regulation that required an owner of coal to leave some of his property in the ground.

The Supreme Court rejected a similar claim by a property owner concerning the right to continue to quarry and remove materials from the land. In *Goldblatt v. Town of Hempstead, supra,* the Supreme Court observed that when addressing the constitutionality of a regulation, it is not "of controlling significance that the 'use' prohibited here is of the soil itself as opposed to a 'use' upon the soil." 369 *U.S.* at 593, 82 *S.Ct.* at 989, 8 *L.Ed.*2d at 133. In any event, BQI did not purchase mining rights or mineral rights in property as such. Rather, it purchased a tract of land that could be put to a variety of uses that included the quarrying of stone.

We hold that Bernardsville pursuant to its police powers has enacted a valid ordinance to limit quarry operations in the interests of the public health, safety, and welfare, and that the ordinance clearly advances a substantial, genuine, and legitimate public purpose. Further, the interference with the property interests of the quarry owner effected by the regulation is not excessive or unreasonable, nor does it deprive the property of substantial value or prevent its use for other economically viable purposes. We conclude that the application of the ordinance does not effectuate an unconstitutional taking of property without due process of law.

## IV

BQI contends that the borough violated its constitutional right to due process and violated the provisions of the Open

Public Meetings Act, *N.J.S.A.* 10:4–6 to –21, arguing that the borough's decision to deny BQI's application for a license was made during a closed executive session rather than in an open public meeting. BQI claims that although the borough formally adopted the resolution denying its application in an open meeting, the real decision to deny was made behind closed doors, and despite the later formality of the public meeting, a due process violation occurred.

Neither the trial court nor the Appellate Division reached the merits of BQI's claim, finding it barred by the Open Public Meetings Act's forty-five day statute of limitations under *N.J.S.A.* 10:4–15a.

In any event, BQI concedes that because the trial court found that the borough's decision to deny its application was arbitrary and capricious and remanded the application to the borough for reconsideration, it no longer has a remedy under the Open Public Meetings Act. On this facet of the appeal the borough contends that its denial of the license was not arbitrary and capricious. We are satisfied on this point to sustain the rulings of the lower courts.

BQI further argues that because of the improper denial of the license, the trial court and Appellate Division erred in not awarding it attorney's fees under 42 *U.S.C.* § 1988, which states in part that "[i]n any action or proceeding to enforce a provision of ... [42 *U.S.C.* § 1983] ... the court in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." The Appellate Division reasoned that even if the local action is not time barred, "the availability of review of that action in the Superior Court prevented such alleged violation from being actionable under [42 *U.S.C.* § 1983]." (citing *Anastasio v. Township of West Orange*, 209 *N.J.Super.* 499, 521–23, 507 *A.*2d 1194 (App.Div.) (recognizing a trial court finding that action taken by a municipality was arbitrary and capricious did not justify finding it a § 1983 civil rights/due process violation under "arbitrary and capricious"

standard and nothing more.), *certif. denied,* 107 *N.J.* 46, 526 *A.*2d 136 (1986)).  The Appellate Division recently held that the court's "discretion" is very limited;  only the prevailing party in a § 1983 action is entitled to receive attorney's fees.  *Gregg v. Township of Hazlet,* 232 *N.J.Super.* 34, 556 *A.*2d 348 (App.Div. 1989);  *see also Blanchard v. Bergeron,* 489 *U.S.* 87, 89 n. 1, 109 *S.Ct.* 939 n. 1, 103 *L.Ed.*2d 67, 72 n. 1 (1989).  Before a plaintiff can be awarded attorney's fees under § 1988 it must have prevailed on its § 1983 claim.  *Singer v. State,* 95 *N.J.* 487, 492, 472 *A.*2d 138 (1984).  BQI did not prevail on a claim that implicates civil rights.  Consequently, we conclude that the plaintiff has no entitlement to attorney's fees under § 1988.

## V

The judgment of the Appellate Division is hereby affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, O'HERN, GARIBALDI and STEIN— 6.

*For reversal*—None.